# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Francisco Cortez,<br><br>　　　　　　　　　Plaintiff,<br>　vs.<br>United States of America,<br><br>　　　　　　　　　Defendant. | CASE NO. 10cv01473-CAB (WMC)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

BENCIVENGO, Judge:

The matter before the Court is the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.　Introduction

Plaintiff Francisco Cortez initiated this action against the United States pursuant to the Federal Tort Claims Act ("FTCA") on July 15, 2010. [Doc. No. 1.] Cortez alleged that Border Patrol Agents David C. Fulton, Patrick J. Kennedy, Beata Kobylecka, and Benjamin W. Metz (collectively "the Agents"), employees of the United States Department of Homeland Security, U.S. Customs and Border Protection, unreasonably detained him and subjected to him to excessive force at the Pine Valley Border Patrol checkpoint. His complaint alleges the three causes of action – False Imprisonment; Assault and Battery; and Negligence.

On May 5, 2011, the Court denied the United States' Motion to Dismiss, or in the alternative for Summary Judgment. [Doc. No. 20.] The Court found that the Agents' decision to stop and question Cortez at the checkpoint, and to direct him to secondary inspection was within their

discretion, however the factual dispute about what occurred at secondary inspection precluded a finding that the discretionary function exception applied to the continued detention and search of the plaintiff, and precluded summary adjudication of the false imprisonment claim. The Court also found factual disputes as to the assault and battery and negligence claims. The Court summarized the issues for trial as 1) whether the Agents had reasonable suspicion to prolong plaintiff's detention; and 2) whether the Agents' assumption of a bladed stance was an unreasonable use of force. [*Id.* at 14.]

On September 1, 2011, the case was reassigned to the undersigned. [Doc. No. 30.] The matter was set for bench trial. [Doc. No. 40.] Trial took place on July 30 and 31, 2012.

## II.    Issues Tried

1. Whether the Agents' detention of plaintiff in secondary constituted a nonconsensual, intentional confinement without lawful privilege for an appreciable period of time, however brief.

2. Whether one or more of the Agents used unreasonable force to detain the plaintiff.

3. Whether the conduct of one or more of the Agents was negligent.

## III.   Findings of Fact

The following facts were undisputed by the parties. At all relevant times plaintiff Francisco Cortez was a special agent with the California Department of Justice, Division of Law Enforcement, Bureau of Narcotics Enforcement. As a narcotics enforcement agent, his primary duties included investigating mid-to-upper level drug traffickers. On September 25, 2009, Cortez traveled from San Diego to El Centro, California to meet with an informant in a drug investigation. Shortly after midnight (September 26), Cortez was returning home to San Diego. He was dressed in plainclothes, driving an unmarked, state-owned white Monte Carlo with tinted windows. Because he was on duty, working as an undercover narcotics agent, he was armed with a sidearm.[1]  He had an additional weapon in a bag on his front seat and a weapon in the trunk of his vehicle. Cortez was driving in the number one lane of Interstate 8 ("I-8") heading west in the Monte Carlo.

Border Patrol Agent Beata Kobylecka was working the midnight shift at the Campo Border Patrol Station. She was patrolling I-8 in a 2008 Chevrolet Tahoe with Border Patrol markings.

---

[1] *See* Proposed Pretrial Order, submitted by plaintiff, Part III, Admitted Facts 6-7, filed on 4/9/12. [Doc. No. 37.]

1  Kobylecka was west-bound on I-8 headed toward the permanent immigration checkpoint at Pine
2  Valley. Cortez passed Kobylecka at an excessive rate of speed.[2] Kobylecka followed Cortez and
3  obtained the vehicle's license plate number. Cortez was aware the Border Patrol vehicle was
4  following him. Kobylecka radioed her dispatch for information about the vehicle. Dispatch informed
5  Kobylecka that DMV had no record on file for the vehicle. Kobylecka, concerned the vehicle might
6  be stolen or involved in smuggling or other illegal activity, then radioed ahead to the Pine Valley
7  Checkpoint and requested the agent follow-up with the driver for more information.
8      As Cortez approached the checkpoint he saw three vehicles ahead of him, two trucks and a
9  small sedan, waived through the checkpoint without inquiry. When he pulled up to the Border Patrol
10 agent, he was stopped. The agent at primary inspection was David Fulton. Agent Fulton recognized
11 the vehicle as the one for which Kobylecka had requested further inquiry.
12     The parties agree that Fulton asked Cortez his citizenship and where he was born, to which
13 Cortez responded U.S. and New York. Fulton then inquired where Cortez was coming from and what
14 had been "going on" there, to which Cortez replied El Centro and "not much." Fulton then inquired
15 where Cortez was going and what was "going on" there, to which Cortez replied San Diego and "a
16 whole lot, but I'm going home." Fulton then asked if Cortez had a driver's license, to which Cortez
17 responded "yes." When Fulton asked to see the driver's license, Cortez did not produce it but instead
18 asked "why."
19     The parties further agree the following exchange took place:
20         Fulton: You don't want to show me your license?
21         Cortez: No, I said I want to know why you want to see my license.
22 Cortez did not produce his license and Fulton directed Cortez to pull into the secondary inspection
23 area.
24     As to what happened after that, the parties disagree. The Court makes the following factual
25 findings based on the testimony and other evidence adduced at trial.
26     Cortez specifically noted in his testimony that as he approached the checkpoint he observed
27 _____
28     [2]  The parties disagree as to how fast Cortez was driving, however, plaintiff does not dispute that he was exceeding the speed limit when he passed Agent Kobylecka.

1  that the three vehicles ahead of him were waived through by the agent without stopping.  He
2  acknowledged that prior to arriving at the checkpoint he was aware he had been followed for a time
3  by a Border Patrol vehicle on I-8 and that he had been speeding.  He stressed that he had never been
4  asked to produce his driver's license at a checkpoint before and that he did not think the request or
5  Fulton's questions were appropriate.  The Court infers from the evidence that at the time of the
6  incident Cortez perceived he was selected for a checkpoint stop due to his speeding and the Border
7  Patrol has no authority to enforce speed laws, so he entered the encounter in a generally uncooperative
8  manner, challenging the Agent's motives and inquiries, and was defensive and non-responsive to the
9  questions and requests of the agent.

10       Cortez testified he told Fulton he was a law enforcement officer but Cortez did not offer to
11  produce his credentials.  Fulton did not ask for credentials, he instead directed Cortez to secondary.
12  Cortez pulled into the secondary inspection area in an abrupt manner.  Border Patrol Agent Benjamin
13  Metz was at secondary inspection.  Kobylecka arrived at the checkpoint and placed her vehicle behind
14  the car Cortez was driving.  Another Border Patrol Agent, Patrick J. Kennedy, provided additional
15  support at secondary.

16       When Kobylecka arrived at secondary she informed Metz that this was the vehicle she
17  observed traveling at what she estimated to be 100 miles per hour and that DMV had no records for
18  its plates.  Both agents approached the vehicle and Metz began to ask Cortez the same questions Fulton
19  had asked regarding Cortez' citizenship status and route of travel.  Cortez was not responsive to Metz'
20  inquiry.  He informed Metz he was an off-duty officer.  Metz asked Cortez for his credentials, but
21  Cortez did not produce them.  Cortez instead challenged Kobylecka's assessment of his speed when
22  she stated she observed him speeding at about 100 miles per hour.  Cortez confronted her with the
23  statement that either her equipment was not functioning or she was lying.  Cortez was argumentative
24  and non-responsive to the agents' requests for information.  Cortez repeated that he was an off-duty
25  officer, but still did not produce his identification or credentials and instead questioned the agents'
26  authority to further detain him, asking "why they were taking the actions they were taking."[3]

27       Cortez testified that he did not offer his credentials because the Agents never asked for them

---

[3] Proposed Pretrial Order, Part III, Admitted Fact 21.  [Doc. No. 37.]

- 4 - 10cv01473

and he did not volunteer them because the Agents were so immediately hostile, screaming at him, shouting profanities and talking over each other, that he felt he could not safely offer to produce his credentials. The Court finds this testimony lacks credibility. Although the situation got progressively tense, it is not believable that all the Agents were so immediately and inexplicably out of control that Cortez could not have safely volunteered his law enforcement credentials immediately when he pulled into secondary. The Court finds more credible the Agents' testimony that Cortez was hostile, uncooperative and repeatedly questioned their actions and authority, rather than provide answers or produce identification or credentials.

Metz requested permission to search the trunk of Cortez' car and requested Cortez exit the vehicle. Cortez refused to consent to an inspection of his trunk, and refused to exit the vehicle.[4] Cortez testified he told the Agents he wanted a supervisor called to the scene. Although Cortez testified he wanted the supervisor because the Agents were screaming at him, using profanity and were so out of control he feared being assaulted, the Court finds Cortez demanded a supervisor because he believed the Agents had no authority to detain him and he wanted to make a complaint.

Since Cortez refused permission for a search of his car, Metz told Cortez he wanted to perform a canine search of Cortez' car, and again asked him to exit the vehicle. Cortez refused. Cortez also informed Metz he was armed. Metz opened the vehicle door and took hold of Cortez' left arm to remove him from the vehicle. Cortez then exited the vehicle on his own.

As Cortez exited his vehicle, Kennedy assumed a defensive position called a "bladed stance," turning at an angle so his sidearm was away from Cortez and placed his hands on or near his belt. He did not draw his weapon on Cortez or place his hand on a weapon as if ready to draw.

Metz conducted a pat down search of Cortez and removed Cortez' sidearm. Metz handed the weapon to Kennedy who secured it inside the patrol station. Metz escorted Cortez to secondary seating. The canine sniff search was performed and the results were negative. Cortez then produced his credentials to the Agents. The Agents told him he could leave. Cortez however stated he wanted to stay and speak to the supervisor who was in route. The supervisor, Agent George Prat, arrived

---

[4] Proposed Pretrial Order, Part III, Admitted Facts 22-23. [Doc. No 37.]

1 about ten minutes later.[5]

2 Cortez made a verbal complaint to Prat about the incident. Cortez also contacted his supervisor, Ernesto Limon, on the telephone. Prat spoke with Limon to confirm that Cortez was a law enforcement agent. Cortez testified that during that conversation, Prat apologized to Limon about the incident and stated his agents were new officers that did not know what they were doing. Prat did not testify at trial, however Limon did, and Limon did not corroborate Cortez's testimony that Prat made any statement of that nature.

Cortez had no physical injury as a result of the encounter.[6] Cortez filed a report of the incident with his employer, the California Department of Justice, and was sanctioned by his employer for his discourteous behavior to the Border Patrol Agents and willful disobedience. Cortez appealed the sanction and the matter was settled with the agreement to eliminate the willful disobedience finding from the sanction.[7]

### IV.   Conclusions of Law

#### A.   The Federal Tort Claims Act

Under the FTCA, the United States is liable for common law torts committed by federal employees within the scope of their federal employment. 28 U.S.C. §§1346(b), 2674. Border Patrol Agents Kobylecka, Fulton, Metz and Kennedy were all federal employees acting within the scope of their federal employment when they detained Cortez. The United States may be liable for the actions of the Agents. Liability is determined by the tort law of the state where the claim arose. *Rhoden v. United States*, 55 F.3d 428, 430 (9th Cir. 1995).

#### B.   Plaintiff's First Cause of Action – False Imprisonment

The FTCA allows liability for false arrest or false imprisonment when such torts are committed by federal law enforcement officers. 28 U.S.C. § 2680(h). Under California law, to prove a false imprisonment claim, plaintiff must establish: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief. *Easton*

---

[5]   Proposed Pretrial Order, Part III, Admitted Facts 27-30. [Doc. No. 37.]

[6]   Proposed Pretrial Order, Part III, Admitted Fact 32. [Doc. No. 37]

[7]   Trial Exhibits 28 and 29.

*v. Sutter Coast Hosp.*, 80 Cal App. 4th 485, 496 (2000). "Once the plaintiff has proven the elements of the tort, the defendant has the burden to establish that the detention or arrest was legally justified." *Rhoden*, 55 F.3d at 430.

Cortez was detained at a permanent checkpoint station. At such stations, Border Patrol officers have wide discretion in selecting motorists to be diverted for the brief questioning involved. *United States v. Martinez-Fuerte,* 428 U.S. 543, 564 (1976). It was within the discretion of the Agents to stop Cortez for brief initial questioning, ask for identification documents and refer him to secondary inspection for further brief questioning in the absence of any individualized suspicion. *Martinez-Fuerte,* 428 U.S. at 562; *United States v. Massie*, 65 F.3d 843, 847-48 (10th Cir. 1995). These actions have already been found by the Court to be lawful within the discretionary function exception, under 28 U.S.C. §2680(a). [Doc. No. 20, 8:4-7.]

Plaintiff's reliance on the Ninth Circuit's recent decision in *United States v. Valdes-Vega*, No. 10-50249, 2012 WL 3024188 (9th Cir. July 25, 2012), is misplaced. In *Valdes-Vega*, the court addressed the need for an officer, on roving patrol, to have a reasonable suspicion based on the totality of the circumstances to believe the particular person being stopped had committed or was about to commit a crime, to initiate a vehicle stop. *Id.* *2-3. This was not a roving stop. Cortez was contacted at a fixed checkpoint station, where such individualized suspicion is not initially required. *See Massie*, 65 F.3d at 847.

Moreover, there were "suspicious circumstances" justifying Agent Fulton's inquiry and decision to refer Cortez to secondary inspection.[8] Fulton was following up on information that the plaintiff was observed traveling in the middle of the night at an excessive speed, in a vehicle with no DMV record and an obstructed view to its interior. The Pine Valley Checkpoint Station is located in an area known for alien and contraband smuggling. When Cortez refused to produce identification in response to the agent's request, Fulton was justified to send Cortez to secondary for further questioning. *United States v. Rascon-Oritz*, 994 F.2d 749, 753 (10th Cir. 1993) (once suspicious

---

[8] Suspicious circumstance is not equivalent to the reasonable suspicion standard. A border patrol agent may ask questions regarding suspicious circumstances, in addition to citizenship matters. *United States v. Sanders*, 937 F.2d 1495, 1499 (10th Cir. 1991). The information Fulton had was that the car was not registered. It was reasonable for Fulton to make further inquiry at primary about the driver's identity.

1 circumstances arose, the agent was entitled to order the individual to secondary to be further detained
2 in order to briefly investigate his suspicion).

3       The issue before the Court is whether Cortez' detention at secondary was legally justified.
4 Detention at secondary beyond routine customs inspection must be based on a valid investigative
5 detention. It requires reasonable suspicion, a particularized and objective basis for suspecting the
6 person stopped of criminal activity. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Reasonable
7 suspicion is determined based on the totality of the circumstances. *United States v. Palos-Marques*,
8 591 F.3d 1272, 1275 (9th Cir. 2010).

9       A brief detention at secondary to complete the investigation Fulton started was within the
10 discretionary function of the Agents. Had Cortez produced his identification and credentials at
11 secondary in response to Metz' request, further detention for the canine search may not have been
12 legally justified. Cortez, however, believing he had been sent to secondary in retaliation for not
13 producing his driver's license to Fulton, continued to obstruct the inquiry causing both further delay
14 and further increased suspicion. Despite stating he was an off-duty officer, he did not produce his
15 identification. He instead challenged the Agents' authority to ask him questions and accused an agent
16 of lying. His behavior was evasive and hostile.

17       The Agents were confronted with a driver in an unregistered vehicle, who refused to provide
18 identification, was argumentative and uncooperative. Based on all the circumstances – the hour of
19 night, the location, the speed the vehicle had been traveling, the appearance of the vehicle and its lack
20 of registration and the driver's refusal to provide identification and answer questions, the Agents had
21 reasonable suspicion to detain Cortez further, for the brief and unobtrusive purpose of a canine search
22 of his vehicle for drugs or aliens. The detention in secondary was legally justified. For the safety of
23 the Agents and the canine unit, it was reasonable to ask Cortez to exit the vehicle for the performance
24 of the search, particularly since Cortez had volunteered he was armed. It was also reasonable, in light
25 of that fact, to search Cortez and secure his weapon.

26       Following the negative canine search, Cortez produced his credentials. The Agents then
27 informed Cortez he could go. Cortez elected to stay to speak with the supervisor. It was no longer a
28

1  "nonconsensual confinement" at that point.[9]  The Court finds that the Agents detention of Cortez at
2  secondary to question him and perform a canine search was a valid investigative detention based on
3  the totality of the circumstances.  The Court finds for the defendant United States on plaintiff's first
4  cause of action for false imprisonment.

### B.  Plaintiff's Second Cause of Action – Assault and Battery

To establish a claim for assault and battery by a law enforcement officer under California law, the force used to detain the plaintiff must be unreasonable. Judicial Council of Cal., Civ. Jury Instr. 1305.  Cortez contended at trial that Agent Metz used a pain compliance hold to forcibly extricate him from his car, grabbing and twisting his wrist.  Further, Cortez contended that as he exited his vehicle, Agent Kennedy took a bladed stance with his hand on his holster ready to draw his weapon.  Cortez testified he was afraid he was about to be shot.  Cortez acknowledged that no weapon was ever drawn and he sustained no injuries.

Agent Metz testified that he opened the car door and took hold of Cortez' left arm to extricate him from the car.  He did not pull him from the car or cause any injury.  The amount of force involved was reasonable to obtain Cortez' cooperation in exiting the vehicle.  Agent Kennedy's assumption of a bladed stance while Cortez was exiting his car was a defensive posture that was not unreasonably aggressive.  His hand was not on his weapon and no weapon was drawn.

Plaintiff has not demonstrated the Agents used unreasonable force to detain him.  The Court finds for the defendant United States on the plaintiff's second cause of action for assault and battery.

### C.  Plaintiff's Third Cause of Action – Negligence

To establish a claim for negligence, under California law, plaintiff must show that (1) the defendant had a legal duty to conform to a standard of conduct to protect the plaintiff; (2) the defendant failed to meet this standard of conduct; (3) the defendant's failure was the proximate or legal cause of the resulting injury; and (4) the plaintiff was damaged.  *Ladd v. County of San Mateo*, 12 Cal 4th 913, 917 (1996).

---

[9] While Cortez remained at the checkpoint station, for safety reasons, the Agents would not return his weapon.  His weapon was returned when he was ready to depart.  The securing of his weapon did not cause any delay in his detention.

Cortez' claim of negligence is based on his assertion that the Agents were negligent when they detained him without justification and used unreasonable force to do so. Having concluded that the detention of Cortez was legally justified and the Agents did not employ unreasonable force in his detention, the Court finds that the plaintiff has not demonstrated that the Agents' conduct was negligent. The Court, therefore, finds for the defendant United States on the plaintiff's third cause of action for negligence.

## V.     Conclusion

For the reasons stated above, it is hereby ORDERED that judgment is entered in favor of Defendant United States of America on Plaintiff Cortez' First, Second and Third Causes of Action. The Court will enter judgment accordingly.

DATED: September 5, 2012

_____
**CATHY ANN BENCIVENGO**
United States District Judge